[No. F004333. Fifth Dist. Mar. 5, 1986.]

Guardianship of DAVID PATRICK DONALDSON et al., Minors.
LOUISE LADD, Petitioner and Respondent, v.
PATRICIA ANN DONALDSON, Objector and Appellant.

478

COUNSEL

Louis P. Etcheverry, Allen, Cornell & Mason and Tracey Felton Resnick for Objector and Appellant.

No appearance for Petitioner and Respondent.

OPINION

FITCH, J.*—

I

*Introduction*

David, age seven, and his five-year-old sister, Tammy, were the subjects of a custody contest between their paternal aunt in California and their maternal grandparents in Illinois.

The children's father obtained sole custody in dissolution proceedings. About two and one-half years later he died and the children were placed informally with the aunt. Unbeknownst to the aunt, the mother made arrangements through an attorney to have the children live with the maternal grandparents in Illinois. The grandparents, under the pretext of visitation, took the children to Illinois.

The aunt and grandparents filed petitions for guardianship almost simultaneously in their respective states. Each state rendered orders granting letters of guardianship: California to the aunt, and Illinois to the grandparents. The aunt did not obtain letters of guardianship. The mother appeals the California order granting letters of guardianship to the aunt.

The issues and our holdings are:

1. Is the order granting letters of guardianship appealable, as opposed to the letters? We hold it is the order.

2. Upon death of a parent who obtained sole custody of the children in a dissolution action, does the surviving parent obtain all rights to custody? We hold "yes."

---

*Assigned by the Chairperson of the Judicial Council.

3. Do the custody rights of the sole parent embrace the rights to transfer temporary physical custody of the children to another in another state? We hold that they do, assuming there are no existing orders which would limit the exercise of such rights.

4. Is the Uniform Child Custody Jurisdiction Act (hereinafter referred to as the UCCJA or the Act) applicable to guardianship proceedings of the person of minors? We hold that it is.

5. Does the application of the UCCJA compel reversal of the order below granting letters of guardianship to the aunt by reason of: (1) the failure of the California court to communicate and consult with the Illinois court to the end that the more appropriate forum for the custody litigation shall be chosen; and (2) the failure of the California court to heed the mother's nomination of the grandparents and use procedures authorized by the Act to obtain relevant, available information concerning the grandparents? We hold that such failures constituted error. The order is reversed.

## II

### *Facts*

David and his sister Tammy lived with their father in Merced, California, when he obtained their sole custody in May 1981 in a marital dissolution proceeding. After the father obtained custody, the mother, in her own words, was "just going from town to town," finding shelter and food at the Salvation Army and other missions. She admitted she saw the children only a "few times."

The father died on November 18, 1983. The Merced County Child Protective Services informally placed the children with the aunt. The mother learned of the father's death on Thanksgiving. She immediately arranged with her parents in Illinois to raise the children. On December 9 the mother contacted an attorney in Merced and asked that appropriate legal steps be taken to enable the children to live with the maternal grandparents.

On Friday, January 20, 1984, several significant events occurred. The mother visited her attorney in Merced and again requested the transfer of custody of her children to the maternal grandparents. The grandparents arrived from Illinois and obtained the aunt's permission to take the children to lunch at McDonald's. Several hours later the grandparents phoned the aunt and informed her they were taking the children with them on the next flight to Illinois. At 4:06 p.m., the aunt filed a petition for guardianship of

the persons and estates of both children in the Merced County Superior Court.

On the date originally set for the hearing on the aunt's petition for guardianship, February 17, 1984, the mother's attorney appeared on behalf of the grandparents, requesting leave to file a motion to dismiss the action for lack of subject matter jurisdiction.

The court granted a continuance for this purpose, and the grandmother filed a motion to dismiss on February 23, 1984. Attached to the motion was an affidavit of the grandmother stating that the mother, as the sole surviving parent, desired the grandparents to have custody of the children and the children were residing with the grandparents in Danville, Illinois.

At the hearing on the motion to dismiss for lack of subject matter jurisdiction on March 19, 1984, the mother's attorney informed the court that the mother had executed an "Entry of Appearance, Waiver of [Service of] Summons, and Waiver of Notice" in a proceeding commenced in Illinois by the grandparents to obtain guardianship of the children. The court and opposing counsel were furnished copies of this waiver. No testimony was taken. After argument the court ruled it had jurisdiction over the subject matter under the UCCJA, and stated that the matter would be set for a contested hearing on the issue of "whether as opposed to the rights of a natural mother the Petitioner [aunt] should be appointed guardian." Neither the court nor counsel discussed the necessity, much less the desirability, of communication with the court in Illinois.

On April 9, 1984, a contested hearing was held in the Merced County Superior Court. The mother and aunt were present; the grandparents were not present. The aunt presented substantial evidence that she could provide a wholesome and stable environment for the children and that maternal custody would be detrimental to the children. The mother admitted to a nomadic existence. She testified that she wanted the grandparents to have custody because they were able to provide the children with the care and attention she could not provide.

In the midst of the proceeding, the mother's attorney requested a brief recess, and after returning advised the court that she had just been informed by her office that the Illinois court, on April 6, 1984, appointed the maternal grandparents as coguardians of the persons and estates of the children.[1] The

---

[1]On April 6, 1984, an order granting letters of guardianship to the grandparents as co-guardians of the persons and estates of the children was signed by Judge John P. Meyer of the Fifth Judicial Circuit of Illinois, Vermilion County.

attorney for the aunt stated that "[T]o the extent that Illinois is a signatory to the Uniform Act on Custody of Children, I suspect the order may be voidable." The court responded, "That would be my thought. So let's go ahead." The mother's attorney then reminded the court that at the hearing to dismiss she had informed the court that the mother had given her consent to the Illinois guardianship proceedings. The court then stated, "I would think that California would probably have the superior right based on the Uniform Child Custody Act."

The court found that it would be detrimental to return the children to the mother, and that it would be in the best interests of the children that the aunt be appointed guardian of the children. The order appointing the aunt as the guardian of the persons and estates of the two children was signed June 19, 1984. Letters of guardianship were never sought or obtained by the aunt. The mother filed a timely notice of appeal from the order.

## III

### Appealability of the Order

■ Although no case has directly interpreted the appealability of the order granting letters of guardianship, we conclude that the order itself, and not the letters, is appealable.

Probate Code section 2750 states: "An appeal may be taken from the making of, . . . a[n] . . . order . . .: (a) Granting or revoking letters of guardianship . . . ." Where, as here, bond was waived, the issuance of letters of guardianship serves merely to solemnize the rights and duties created by the court's order. (See *Southern T. & C. Bk.* v. *S.D. Sav. Bk.* (1919) 45 Cal.App. 294, 297 [187 P. 435].) The order established the right to custody of the children, and it is this right assailed on appeal. (See *Guardianship of Brazeal* (1953) 117 Cal.App.2d 59, 60 [254 P.2d 886].) We conclude the orders granting the aunt letters of guardianship disposed of the rights of the parties, and hence are appealable.

## IV

### Custody Rights of a Sole Parent

Prior to the father's death he was awarded temporary physical custody of the two children pursuant to a marital dissolution order.[2] Upon his death, the custody order terminated. ■ "Divorce is a personal action that does

---

[2]Neither an interlocutory nor final judgment of dissolution was obtained.

not survive the death of a party." (*In re Marriage of Williams* (1980) 101 Cal.App.3d 507, 510 [161 Cal.Rptr. 808].) As stated in *In re Marriage of Shayman* (1973) 35 Cal.App.3d 648, 651 [111 Cal.Rptr. 11]: "[T]he death of a party to a dissolution proceeding abates the cause of action, as the status of the parties is no longer before the court, and . . . the court thus loses jurisdiction to make any *further determination* of . . . rights . . . ." (Italics in original.)

■ Upon the death of the father, the mother immediately became entitled to sole custody of her children. Civil Code section 197 provides, "If either the father or the mother be dead . . . the other is entitled to [a child's] custody . . . ." "[U]pon the death of the parent to whom is awarded the custody of a minor child by the decree of divorcing the parents, the other parent becomes entitled to the custody." (*In re Arkle* (1928) 93 Cal.App. 404, 410 [269 P. 689].)

"Custody embraces the sum of parental rights with respect to the rearing of a child, including its care." (*Burge* v. *City & County of San Francisco* (1953) 41 Cal.2d 608, 617 [262 P.2d 6].) A parent's right to sole legal and physical custody includes the right and responsibility to make decisions relating to the health, education, and welfare of the child. (See Civ. Code, § 4600.5, subd. (d).) We find embraced within the sum of parental rights is the right of a sole or surviving parent having exclusive custody to determine that the health, education and welfare of the children requires they be placed in the temporary physical custody of persons who will provide them with a wholesome environment. (See *Guardianship of Turk* (1961) 194 Cal.App.2d 736, 739-740 [15 Cal.Rptr. 256]; see also *Yates* v. *Yates* (1956) 138 Cal.App.2d 711, 713 [292 P.2d 934].)

In the absence of a court order restraining removal of the children from the State of California, the mother had a right to change the residence of the children to Illinois. Civil Code section 213 provides: "A parent entitled to the custody of a child has a right to change his residence, subject to the power of the proper Court to restrain a removal which would prejudice the rights or welfare of the child."

With the express consent of the parent having exclusive custody the grandparents took custody on the understanding that the children would live with them in Illinois. The grandparents had the right to remove the children from California on January 20, 1984, and take them to their residence in Illinois. We conclude the children were lawfully in the physical custody of the grandparents in the State of Illinois at the commencement of the guardianship proceedings in Illinois.

V

*Applicability of the UCCJA*
*to Guardianship Proceedings of the Person*

■ Should guardianship proceedings of the person of a minor be governed by the UCCJA? Before embarking onto uncharted waters, we observe that we must be guided by the Polaris of all child custody law—the best interests of the children.

Probate Code section 1514, subdivision (b), provides: "In appointing a guardian of the person, the court is governed by the provisions of Section 4600 of the Civil Code, relating to custody of a minor." Section 4600, subdivision (b), of the Civil Code, provides: "Custody should be awarded . . . according to the best interests of the child . . . ." ■ As stated by Brigitte M. Bodenheimer, reporter for the special committee which drafted the Act: "The cardinal rule of custody law is that the court must be governed above all by a concern for the best interests or welfare of the child." (Bodenheimer, *The Uniform Child Custody Jurisdiction Act: A Legislative Remedy for Children Caught in the Conflict of Laws* (1969) 22 Vand. L.Rev. 1207, 1209-1210.)

■ On appeal the mother initially contended the trial court incorrectly assumed the Act applied to the guardianship proceedings below. Upon further briefing, however, the mother argues that the UCCJA, if applicable, supports the mother's contentions for reversal. We agree with the latter argument.

California adopted the UCCJA in 1973 as Civil Code sections 5150-5174.[3] The UCCJA governs child custody proceedings, namely actions "providing for the custody of a child." (§ 5151, subd. (2) [§ 2, subd. (2)].) Guardianship of the person proceedings are custody proceedings. They can result in the appointment of a person who "has the care, custody, and control of" a child. (Prob. Code, § 2351, subd. (a).)

As stated in *In re David C.* (1984) 152 Cal.App.3d 1189, 1203, footnote 4 [200 Cal.Rptr. 115]: "California has three major bodies of law concerned with the child custody decision: the law of guardianship of the person, the law of juvenile dependency, and . . . general custody law applied most

---

[3]All references are to the Civil Code unless otherwise indicated. Parallel references to the Uniform Act are contained in brackets.

For a list of all California UCCJA cases through the fall of 1985 and a concise summary of trial court holdings and appellate decisions, see Adams & Sevitch, 1985 California Family Law Practice, at pages 2974-2975.

frequently in marriage dissolution proceedings." The California Supreme Court in *In re B.G.* (1974) 11 Cal.3d 679, 696 [114 Cal.Rptr. 444, 523 P.2d 244], noted that "California has at least eight separate proceedings in which custody questions can be litigated," citing Bodenheimer, *The Multiplicity of Child Custody Proceedings—Problems of California Law* (1971) 23 Stan.L.Rev. 703, 704-705. Bodenheimer includes "the law of guardianship of the person" among the eight procedures available to litigate child custody. (*Id.*, at p. 704.)[4]

The purposes of the Act, summarized succinctly in *Kumar v. Superior Court* (1982) 32 Cal.3d 689, 695 [186 Cal.Rptr. 772, 652 P.2d 1003], are compatible with guardianship proceedings. "The Uniform Act . . . was promulgated for the stated purposes of avoiding jurisdictional competition and conflict, promoting interstate cooperation, litigating custody where child and family have closest connections, discouraging continuing conflict over custody, deterring abductions and unilateral removals of children, avoiding relitigation of another state's custody decisions, and promoting exchange of information and other mutual assistance between courts of sister states."

Section 5150 provides that the UCCJA should be construed to "promote the general purposes" of the Act, one purpose being "[t]o make uniform the law of those states which enact it." (§ 5150, subds. (1)(i), (2) [§ 1, subds. (a)(9), (b)].) The Ohio Supreme Court in *In re Guardianship of Wonderly* (1981) 67 Ohio St.2d 178 [21 Ohio Ops.3d 111, 423 N.E.2d 420, 423], held the UCCJA applies to a proceeding to terminate guardianship. The Missouri courts likewise have applied the UCCJA to guardianship of the person actions involving minors. (*In re Estate of Patterson* (Mo.App. 1983) 652 S.W.2d 252, 254-255.) Our research discloses no court rejecting application of the UCCJA to guardianship proceedings. We promote uniformity by following reasonable interpretations of the reach of the Act by sister state courts.

The children here, subjects of conflicting decrees rendered by California and Illinois, are vulnerable to the very abuses the Act seeks to cure. With the California order in hand, the aunt could seek to abduct or otherwise unilaterally remove the children from Illinois. We have a "conflict" with a sister court, which promotes "continuing controversies over child custody." Although it might be in the best interests of the children to visit with their relatives in California, the grandparents would probably resist such visitation in light of the California order.[5]

---

[4]At least one expert in the area of California family law anticipated the potential application of the UCCJA to guardianship of the person proceedings involving minors. (5 Markey, Cal. Family Law Practice and Procedure, § 101.03[1], pp. 101-13—101-14.)

[5]For a striking example of the havoc created by conflicting decrees see *Peery v. Superior Court* (1985) 174 Cal.App.3d 1085 [219 Cal.Rptr. 882].

If the UCCJA is not applicable to guardianship proceedings, the abuses which the Act seeks to prevent are perpetuated, and its salutory purposes not realized. We conclude application of the UCCJA to these proceedings promotes the best interests of the children of this state. Accordingly, we hold the UCCJA is applicable to guardianship proceedings of the person of a minor.[6]

## VI

### The Court's Failure to Comply
### With the Requirements of the UCCJA

The basic scheme of the Act for the assumption of initial jurisdiction is simple.[7] One court assumes full responsibility for the child, that court being the one that has the greatest access to relevant information about the child and the family. Normally, this is the home state of the child, the state where the child has lived for six months prior to the proceeding. (§ 5152, subd. (1)(a) [§ 3, subd. (a)(1)]; § 5151, subd. (5) [§ 2, subd. (5)].) Home state jurisdiction extends for an additional six months if the child has been removed from the state, provided a parent or person acting as parent continues to live in the home state. (*Ibid.*)

Alternatively, a court may assume jurisdiction provided the child and a contestant have a "significant connection" with the state and there is available in that state substantial evidence concerning the child's welfare. (§ 5152, subd. (1)(b) [§ 3, subd. (a)(2)].) Assumption of jurisdiction because of a "significant connection" must be in the best interest of the child, not the contestants. "Physical presence" of the child alone does not suffice to confer jurisdiction. (Commissioner's Note, 9 Uniform Laws Annot. (1973) at pp. 124-125; § 5152, subd. (2) [§ 3, subd. (b)].) The "significant connection" basis for jurisdiction requires maximum rather than minimum contact with the state, and is intended to limit rather than proliferate jurisdiction. (*In re Marriage of Ben-Yehoshua* (1979) 91 Cal.App.3d 259, 265, fn. 3 [154 Cal.Rptr. 80]; *Bacon v. Bacon* (1980) 97 Mich.App. 334; see also *Custody of Holman* (1979) 77 Ill.App.3d 732 [396 N.E.2d 331].)

---

[6]In thus holding, we are aware that the "Declaration Under Uniform Custody of Minors Act" form approved by the Judicial Council must be filed when seeking letters of administration for guardianship of a minor's person. (§ 5158 [§ 9].) This new requirement, however, complements the existing notice requirements of the Probate Code in guardianship proceedings. (See Prob. Code, §§ 1510, subd. (f), 1512.)

[7]We analyze the dispute as involving the assumption of initial jurisdiction and do not address the issues of jurisdiction to modify or rendition of full faith and credit to a sister state decree. (See *Kumar v. Superior Court, supra,* 32 Cal.3d at p. 699.) Here, both courts could and should have contacted the other prior to the rendition of the other's custody order.

■ The Merced County Superior Court properly assumed initial jurisdiction. The children resided in Merced County during their entire lives, first with their mother and father, then their father, and for the preceding two months with their aunt. California was their "home state" (§ 5151, subd. (5) [§ 2, subd. (5)]), that is, the state in which they lived for at least six consecutive months immediately preceding the filing of the aunt's petition for guardianship. If, perchance, the children were en route to Illinois and were not physically present in California when the aunt filed her petition on January 20, 1984, California's "home state" jurisdiction would be extended for an additional six months, for both the aunt and mother were in California. (§ 5152, subd. (1)(a) [§ 3, subd. (a)(1)].)

■ Illinois also assumed initial jurisdiction in substantial compliance with the Act pursuant to the "significant connection" section of the UCCJA.[8] (§ 5152, subd. (1)(b) [§ 3, subd. (a)(2)].) The grandparents had lawful custody of the children in Illinois pursuant to the express permission of the mother.[9] The Illinois court had available substantial evidence concerning the children's future care, protection, training and personal relationships. There were maximum, as opposed to minimum, contacts with the state of Illinois. (See *In re Guardianship of Wonderly, supra,* 423 N.E.2d 420, 424-425.)[10]

■ At this juncture we have two state courts, both seeking to exercise initial jurisdiction in substantial conformity with the Act: California under the "home state" section (§ 5152, subd. (1)(a) [§ 3, subd. (a)(1)]), and Illinois under the "significant connection" section (§ 5152, subd. (1)(b) [§ 3, subd. (a)(2)]). The framers of the Act envisioned just such a conflict in the assumption of initial jurisdiction. ■ "While jurisdiction may exist in more than one state under the 'home state' and 'strong contacts' clauses, jurisdiction may not be *exercised* concurrently in two or more states." (Bodenheimer, *The Uniform Child Custody Jurisdiction Act: A Legislative Remedy for Children Caught in the Conflict of Laws, supra,* 22 Vand.L.Rev., at p. 1230, italics in original.)

---

[8]Whether the best interests of the children would be served by Illinois jurisdiction *as opposed to* California jurisdiction was never determined, as discussed later.

[9]While the grandparents' conduct in removing the children from California may have entitled the Illinois court to decline to exercise jurisdiction (§ 5151 [§ 8]), the question was not litigated below. We do not sanction the grandparents' conduct. However, we cannot say the Illinois court was barred as a matter of law from assuming jurisdiction. (See *In re Marriage of Ben-Yehoshua, supra,* 91 Cal.App.3d 259, 268; *Nelson* v. *District Court in and for Second Jud. Dist.* (1974) 186 Colo. 381 [527 P.2d 811, 814].)

[10]Under the facts, we do not find the mother's actions constituted abandonment; she actively provided for the children's continuing care and welfare. (See *Carpenter* v. *Carpenter* (1984) 326 Pa.Super. 570 [474 A.2d 1124, 1128]; *Wenz* v. *Schwartze* (1979) 183 Mont. 166 [598 P.2d 1086, 1094].)

■ ■ ■ ■ To avoid the possibility of conflicting initial custody decrees in two states, the Act uses a combination of three basic devices: (1) the parties are obligated to inform their respective courts of pending proceedings in another jurisdiction (§ 5158, [§ 9]); (2) a court, upon being informed of an action pending in another state, is required to communicate and consult with the other state court to the end that the case may be litigated in the most appropriate forum (§ 5155, subd. (3) [§ 6, subd. (c)]); and ultimately (3) if the conflict is not resolved by communication and consultation between the courts, the priority-of-filing rule applies (§ 5155, subd. (1) [§ 6, subd. (a)].)[11]

■ The resolution of jurisdictional conflict between two states by direct interstate judicial communication and consultation is not discretionary; it is mandatory. (§ 5155, subd. (3) [§ 6, subd. (c)]; see *In re Marriage of Hopson* (1980) 110 Cal.App.3d 884, 900 [168 Cal.Rptr. 345].) This subdivision uses the word "shall" in reference to the duty to communicate. The mandatory duty to communicate comports with the purpose of the Act to "[p]romote cooperation with the courts of other states to the end that a custody decree is rendered in that state which can best decide the case in the interest of the child." (§ 5150, subd. (1)(b) [§ 1, subd. (a)(2)].) The purpose of such mandate ensures litigation of the custody issues in the "more appropriate forum," i.e., that forum which has the greater access to relevant information.

Thereafter, evidence is channeled into the one "custody" court, so that a determination of custody is made in light of all relevant evidence. (§§ 5168-5171 [§§ 19-22].) By adherence to the communication and cooperation mandate, courts "[a]void jurisdiction competition and conflict with courts of other states in matters of child custody . . . ." (§ 5150, subd. (1)(a) [§ 1, subd. (a)(1)].)

If this scheme is followed, out-of-state contestants may be joined as parties (§ 5159 [§ 10]). Provided the parties are given reasonable notice of the proceedings (§ 5154 [§ 5]), they are bound by the custody decree. (§ 5161 [§ 12].) Payment of necessary travel expenses may be ordered so that all contestants are encouraged to appear. (§ 5160 [§ 11], § 5168, subd. (2) [§ 19, subd. (b)], § 5169, subd. (3) [§ 20, subd. (c)].)

---

[11]Bodenheimer states that "an ultimate conflict between two opposing custody decrees is averted by the priority-of-filing rule of the Act. The second court must yield jurisdiction to the court in which a custody action was pending first. An action is 'pending' under this rule when it is commenced, that is, when it is filed not when process is served." (Bodenheimer, *Interstate Custody: Initial Jurisdiction and Continuing Jurisdiction Under the UCCJA.* (1981) 14 Fam.L.Q. 203, 213, but see *Plas* v. *Superior Court* (1984) 155 Cal.App.3d 1008, 1021 [202 Cal.Rptr. 490].)

Here, the objector's attorney informed the California court at the hearing on the motion to dismiss on March 19, 1984, that the mother had filed appropriate waivers in a guardianship proceeding commenced by the grandparents in Illinois. Furthermore, and of critical importance, the grandmother's motion to dismiss filed February 23, 1984, made clear that the mother, as the surviving parent, had nominated the children's grandparents as the coguardians of her minor children. Not only did the mother, as the sole surviving parent, have a statutory right to make this nomination (Prob. Code, § 1500, subd. (b)), but also the court was required by statute to give that nomination substantial consideration.[12]

Nevertheless, the trial court determined that it had jurisdiction to proceed, set the case for a contested hearing, stating that the sole issue would be whether "as opposed to the rights of the natural mother the Petitioner [aunt] should be appointed guardian." The court made no effort to contact the Illinois court; the court failed to seek information concerning the grandparents in Illinois.

In the case of *Vanneck* v. *Vanneck* (1980) 427 N.Y.S.2d 735, 739 [404 N.E.2d 1278], divorce and custody proceedings were commenced almost simultaneously in Connecticut and New York. The court held that when the New York court learned of the Connecticut proceeding, the focus of inquiry should not have been whether New York properly had jurisdiction, but whether Connecticut was exercising jurisdiction in substantial conformity with the Act. The court stated that although Connecticut should not use the "significant connection" test to proliferate jurisdiction, nevertheless the New York court "must heed the statutory command to defer adjudicating the dispute and communicate with the foreign court." (*Ibid.*)

Similarly, in the court below, the focus should not have been exclusively on whether California properly assumed jurisdiction. The California court should have contacted the court in Illinois and determined whether Illinois was exercising jurisdiction in substantial conformance with the Act and conferred with the Illinois court, to the end that "the more appropriate forum" litigate the custody issues. Regardless of which state is first in time to receive the initial pleadings, where neither court has yet rendered a decree, the first step is communication between the courts to determine the more appropriate forum for litigation of the custody issue.

---

[12]Probate Code section 1514 provides that in appointing a guardian of the person of a child the court is "governed by the provisions of Section 4600 of the Civil Code . . . ." Section 4600, subdivision (a), provides "the court *shall* consider and give due weight to the nomination of a guardian of the person of a child by a parent under Article 1 (commencing with Section 1500) . . . of the Probate Code." (Italics added.)

Wholly aside from the jurisdictional issue, the out-of-state court's cooperation should have been solicited in obtaining relevant evidence pursuant to section 5168 [§ 19]. This information was particularly significant as the real custody contest was between the aunt and grandparents, not the mother and aunt. All available relevant evidence concerning the grandparents should have been sought by the California court.

The court's failure to obtain available out-of-state relevant evidence resulted in a custody determination based upon inadequate information. Without an inquiry into the comparative merits of the parties—here the "parties" being the aunt and grandparents—a determination of the child's best interests cannot be made. One-sided determinations inure to the detriment of the children. A court which has before it the maximum available evidence is a court most likely to make the best custody decision. Conversely, a court which does not avail itself of procedures under the Act to obtain available relevant evidence, blinds itself to facts which might result in a wholly different decision. Although the ultimate decision of the court may be correct, that would be fortuitous rather than intelligently conceived. A child's right to a proper custody determination cannot rest upon fortuity.

Without communicating with the Illinois court, the California court knowingly rendered conflicting decrees. The issue of whether California or Illinois was the more appropriate forum never was determined. Because of the court's failure to utilize the procedures of the Act to obtain information concerning the grandparents, the issue of whether the children's best interests would be served by custody with the grandparents or the aunt never was determined. The lack of information obscured the trial court's view of Polaris to the prejudice of the children.

The orders are reversed.

Hamlin, Acting P. J., and Best, J., concurred.